LILLIAN A. KERWIN *vs.* GLADYS M. DONAGHY & others
(and a companion case [1]).

Bristol.    October 23, 1944. — February 1, 1945.

Present: FIELD, C.J., LUMMUS, QUA, RONAN, & SPALDING, JJ.

*Trust,* Express trust: what constitutes, validity; Parol trust.    *Gift.*
*Personal Property,* Ownership, Transfer of title.    *Evidence,* Extrinsic
affecting writing.    *Husband and Wife.    Will,* Waiver.    *Equity Juris-*
*diction,* Plaintiff's clean hands.

A daughter, without formal delivery of stocks, bonds and bank accounts
of her father already in her possession and standing in her name, ac-
quired legal title thereto upon the execution by them of a trust docu-
ment under seal formally stating that she would hold the property
as trustee for his benefit during his life and as her own property upon
his death.

That the settlor may have established an inter vivos trust of the bulk
of his property in order to render the making of a will practically un-
necessary and that he reserved the power to alter, amend or revoke
the trust did not make the trust testamentary in nature.

Beneficiaries of the estate of a decedent who, with a definite purpose
and not as a sham, by a formal and complete trust instrument and
without fraud, duress or mistake, had made an actual and effective
inter vivos transfer of the bulk of his personal property to his daughter
to be held by her in trust for his benefit during his life and as her own
property upon his death, were barred by the parol evidence rule from
showing after his death that the transfer had not been made with the
intent to give the property to the daughter at his death or to deprive
the other beneficiaries of his estate of any share therein and that the
property in fact formed part of his estate.

A transfer by a husband of the bulk of his personal property to his daughter
to be held by her in trust for his benefit during his life and as her own
property upon his death, with the power reserved to him to alter,
amend or revoke the trust, could not properly be found to have been
intended as a mere sham where he made it for the purpose of disin-
heriting his wife.

An oral promise made by a daughter to her father to do the "right thing"
by her stepmother was insufficient to show that the daughter thereby
became a trustee for the distributees of her father's estate of a re-

[1] The companion case is a petition in equity in the Probate Court, brought
by Gladys M. Donaghy and others, executors of the will of William J. Kerwin,
against Lillian A. Kerwin, under G. L. (Ter. Ed.) c. 215, § 6, as amended, to
recover for the estate real estate and personal property alleged to have been
transferred to her through fraud.    That case will be dealt with later in the
opinion.

mainder interest which the daughter then had under a trust of the bulk of her father's property previously established by him for the benefit of himself during his life and for the benefit of the daughter upon his death.

In this Commonwealth a husband, without the knowledge or consent of his wife, during his life may dispose of any or all of his personal property for the sole purpose of removing the property disposed of from his estate at his death and thereby preventing his wife from sharing therein as a beneficiary of his estate, where the disposition is not made to hinder and defeat her in enforcing her marital rights to support by him or in breach of an obligation to her under an antenuptial contract; and her rights resulting from a waiver of his will under G. L. (Ter. Ed.) c. 191, § 15, do not extend to property so disposed of by him.

Fraud of a decedent in having stocks in the possession and name of his daughter for the purpose of evading taxation did not bar a petition by a beneficiary of his estate seeking to have the daughter ordered to turn over the stocks to the decedent's executor, where the petitioner did not participate in the fraud and was not obliged to rely thereon in making out a case on the ground that the stocks in fact had not belonged to the daughter but to the decedent at the time of his death.

Two PETITIONS IN EQUITY, filed in the Probate Court for the county of Bristol on October 19, 1942, and May 15, 1942, respectively.

The cases were heard by *Hitch*, J.

*T. M. Quinn*, (*A. P. Doyle* with him,) for the respondents in the first case and the petitioners in the second case.

*C. A. Barnes*, for the petitioner in the first case and the respondent in the second case.

*T. F. O'Brien*, for the intervener.

LUMMUS, J.   The widow of William J. Kerwin, late of New Bedford, brought this petition in equity in the Probate Court under G. L. (Ter. Ed.) c. 230, § 5, as amended (*Walsh* v. *Mullen*, 314 Mass. 241), against his daughter Gladys M. Donaghy and the executors of his will (the executors having refused to bring suit) to recover for the estate a large number of stocks, bonds and deposits in banks, standing in the name of or held by the respondent Gladys M. Donaghy, but owned, it was alleged, by the estate of William J. Kerwin.   One of his two sons, Ernest W. Kerwin, intervened, and joined with the widow in seeking relief against Gladys M. Donaghy.   The Probate Court, on May 28, 1943, entered a decree ordering the respondent Gladys

M. Donaghy to transfer and deliver the stocks, bonds and bank deposits in question to the executors of the will of William J. Kerwin. She appealed. The case comes here upon a report of the evidence, with a finding of material facts.

William J. Kerwin died on April 20, 1941, leaving as his widow his second wife, Lillian A. Kerwin, whom he had married on February 15, 1926, when he was fifty-seven years old and she was thirty-nine. They had no children. She was a widow with a young son when they married. William J. Kerwin left three adult children by his first marriage, Harold E. Kerwin, Gladys M. Donaghy, and Ernest W. Kerwin. The eldest son, William J. Kerwin, Junior, had died about a year before his father, leaving a widow, Estelle C. Kerwin, but no issue. Gladys was unmarried when her father married the second time, and lived with her father and his second wife until she herself married one Paul A. Donaghy in July, 1926.

At that time William J. Kerwin was worth, according to his own judgment, half a million dollars. He had been superintendent of the Beacon Manufacturing Company for twenty-five years, and his annual income from that company alone amounted to $25,000. He retired from business in June, 1927, and thereafter had no regular occupation. Although his property evidently diminished in value afterwards, he always seemed to have plenty of money for his needs and those of his family, until his last illness.

On December 12, 1928, William J. Kerwin executed his will,[1] which after his death was duly proved and allowed. On November 12, 1941, his widow filed a waiver of the will,

---

[1] In the will he used the adjective "beloved" in speaking of his wife and his children as well. He appointed his children Gladys and Harold, and Thomas M. Quinn, Esquire, as executors. He divided the household effects among his wife and children. He gave pecuniary legacies to grandchildren, but those were revoked by a codicil executed on November 28, 1936, which also was proved and allowed. He spoke of gifts made to residuary legatees, and declared that "all of said gifts were complete and outright and not advancements." He provided that any gifts to any legatee made after the execution of the will should be on account of the legacy. The seventeenth paragraph of the will divided the residue into five equal parts, and gave one part to each of the following: his widow, his daughter Gladys, and his sons William, Harold and Ernest. The codicil ratified and confirmed the will except as changed by the codicil.

and claimed the interest in the estate that she would have taken had he died intestate.

The judge found in substance that from a time as early as 1923 William J. Kerwin was addicted to the folly of carrying most of his property in the names of some of his children, with the understanding that it should remain his and should be turned back to him at his request. His purpose was to defraud the Federal government by pretending to divide his income so as to avoid large surtaxes. The parts of his property held by his children other than Gladys were conveyed either to Gladys or back to him. In 1929 and thereafter the bulk of his property was held by and in the name of Gladys, and was kept in a safe deposit box of which she was the proprietor, although he had access to the box and kept the key to it in his desk. Many of the stock certificates, standing in her name, bore and still bear her indorsement in blank. In 1934, apparently with his consent, she cancelled his right of access, but that, the judge found, "was entirely consistent with a desire on Mr. Kerwin's part to make it appear, in case it should be questioned, that Gladys and not he was the owner of the contents of, the box. He would have no difficulty in having Gladys go to the box with him and he kept the key to the box in his desk. It was customary when Mr. Kerwin wanted money to telephone Gladys to put it in his bank account which she promptly did whenever he called, excepting towards the last" of his life, during his last illness. During 1940 she paid him at his request about $15,000. It is hard to see how the surtaxes could be lessened by holding the bulk of his property in the name of Gladys after he ceased in 1927 to earn money, unless upon the tax returns the income was divided between him and Gladys. Whether it was or not does not appear.

Nothing in the relations of William J. Kerwin with his children made it likely that he would wish at any time to give all his property to Gladys and cut the others off. The judge found that "Mr. Kerwin and his wife got along well excepting for occasional times when there were some disagreements, but not very serious, and towards the last of

his life they were very close to each other and he was solicitous for her welfare." Nevertheless the judge found that "he told Harold that he had put stock in Gladys'. name because Mrs. Kerwin made so many demands for money he was going to see when he passed on that his children were going to have the money." It was, the judge found, "as a result of a temporary disagreement between William J. Kerwin and his wife" that he executed two trust agreements in August, 1936.

At that time William J. Kerwin consulted John D. Kenney, Esquire, a lawyer in New Bedford. Kerwin came alone at the first visit to the lawyer, but on later occasions Gladys accompanied him. He told the lawyer that he wished to make sure that at his death Gladys would own the property that she was holding for him. The lawyer advised him that a will would be ineffective, for his wife could waive the will. The lawyer advised a trust, and two formal trust agreements were drawn, and were executed by William J. Kerwin and by Gladys. One agreement dealt with the stocks and bonds, the other with the bank deposits. The agreements were substantially identical in their terms.

In these agreements Gladys declared herself trustee of a large number of specified stocks, bonds and bank deposits[1] "to pay the net income therefrom to said William J. Kerwin for and during the term of his natural life . . . and upon the decease of said William J. Kerwin to hold said fund, together with any undistributed income therefrom, to her own use and behoof absolutely forever." He reserved the right during his life "to alter, amend or revoke this agreement in whole or in part, by giving written notice thereof to said Gladys M. Donaghy." He covenanted, agreed and declared that he had no interest in the trust

---

[1] The trust agreements, which were under seal, included the following provisions: "That whereas, said William J. Kerwin has heretofore transferred and delivered to said Gladys M. Donaghy certain . . . [property] a schedule of which is annexed hereto . . . and whereas the parties hereto are desirous of definitely setting forth their respective rights and duties relative thereto . . . said Gladys M. Donaghy hereby covenants and agrees with said William J. Kerwin that she will hold said . . . [property] and the proceeds thereof, together with any additions and accumulations thereto (all of which property shall hereinafter be called 'the fund') upon the following uses and trusts . . .." — REPORTER.

property except that set forth in the agreements. It was provided that "this trust agreement shall be binding upon the heirs, executors and administrators of the parties hereto." It was provided that the trustee "shall not be obligated to disclose the existence of this trust to any person, nor shall she be required to have said securities registered or recorded in her name as trustee, nor shall she be forbidden to mingle said securities or the income therefrom with her own funds . . .."

The stocks, bonds and bank deposits to which the trust agreements related were in the main the same as those which the decree ordered Gladys M. Donaghy to transfer to the executors. [1]

The property covered by the two trust agreements comprised substantially all the property that William J. Kerwin had, except a comparatively small amount that he transferred to Lillian A. Kerwin in 1940 and 1941, and that forms the subject matter of the companion case which is hereinafter dealt with. Late in 1940 he was disturbed about the condition of his affairs, and was trying to reach Gladys for the purpose of arranging his affairs so that what he considered his property would form part of his estate if he should die, to the end that his wife and all his children would be protected. Gladys apparently avoided any considerable talk with him. He was in bad health, and entirely dependent on Gladys for money. On October 9, 1940, he got Gladys and Harold together, and asked them whether they would do the "right thing" by his wife. When they said they would, he fell on his knees and said "Thank God

---

[1] But in addition to the stocks specified in the trust agreements, Gladys M. Donaghy held certificates for three hundred fifty shares of the stock of Beacon Manufacturing Company, one hundred fifty of them in her name, one hundred fifty of them in the name of Harold E. Kerwin, indorsed by him in blank, and fifty of them in the name of Ernest W. Kerwin, indorsed by him in blank. She held also a certificate for eighty-seven shares of the probably worthless stock of Dexdale Hosiery Mills in the name of Harold E. Kerwin but indorsed by him in blank. She testified that she held the Beacon stock on the terms stated in the trust agreements, but that she intended to turn over to Harold and Ernest the shares standing in their names. The judge found that there was no understanding that these stocks should belong to Gladys, subject to a life interest in her father, to the exclusion of the widow and the other children. Accordingly the final decree included these stocks in the property which Gladys was ordered to transfer to the executors.

for that." He apparently rested content with that vague assurance, and did not then remember or appreciate the fact that under the trust agreements he had reserved a power of revocation of the trusts. Not unlikely he was then too ill to take decisive action, and still trusted Gladys, although he was beginning to doubt her. When he died there was little if anything remaining in his hands.

The judge had the task of discovering the truth in the tangled web of deceit that had been woven about the ownership of the property. As to the basic facts dependent upon the credibility of the witnesses, his findings are entitled to great weight, and we see no reason to disagree with them. But his inferences of fact from those basic facts, and his conclusions of law, are fully open to review by this court. *Malone* v. *Walsh*, 315 Mass. 484, 490. *New England Trust Co.* v. *Commissioner of Corporations & Taxation*, 315 Mass. 639, 644. *Swinford* v. *Welch*, 316 Mass. 112, 117. *MacLennan* v. *MacLennan*, 316 Mass. 593, 595. *Cooperstein* v. *Bogas*, *ante*, 341, 345. *Jurewicz* v. *Jurewicz*, *ante*, 512, 513–514.

Those inferences and conclusions are as follows: "Said securities and bank accounts were at no time given to Gladys by her father to have as her own property. Said pretended trust instruments were made as a result of a temporary disagreement between William J. Kerwin and his wife . . . they were never intended to be carried out according to their terms but constituted an illusive device to deprive the wife of any substantial interest in her husband's estate as his widow. It was not intended thereby to give the property all to Gladys upon her father's death, or to deprive his sons of any share therein as heirs or legatees of William J. Kerwin. Said trusts are collusive and invalid and the securities and bank accounts . . . are the property of the estate of William J. Kerwin." The main question before us is whether these inferences of fact and conclusions of law are correct.

Up to the time of the execution of the trust agreements, it could have been shown by oral evidence that there had been no beneficial gift of the property to Gladys because

of the absence of a deed, or of proof of donative intent coupled with delivery (*Rock* v. *Rock,* 309 Mass. 44, 47; *Reardon* v. *Whalen,* 306 Mass. 579; *Murphy* v. *Smith,* 291 Mass. 93; *Bedirian* v. *Zorian,* 287 Mass. 191, 195), or because of proof that she took title to the property upon an oral trust in favor of her father and his estate. *Rock* v. *Rock,* 309 Mass. 44, 47. *Russell* v. *Meyers,* 316 Mass. 669, 672. And even after the trust agreements were executed, a third person not a party to them nor claiming under them, whose rights might be affected by them — for example, the Federal taxing authorities — could show by extrinsic evidence that they were false and illusory and did not express the real transaction between Gladys and her father. *Kellogg* v. *Tompson,* 142 Mass. 76. *Guaranty Security Corp.* v. *Eastern Steamship Co.* 241 Mass. 120, 123. *Tripp* v. *National Shawmut Bank,* 263 Mass. 505, 511. *Commonwealth* v. *Weinfield's Inc.* 305 Mass. 108. *Lamson & Co. (Inc.)* v. *Abrams,* 305 Mass. 238, 243, 244. *Wanders's Case,* 308 Mass. 157. *Commonwealth* v. *Hayes,* 311 Mass. 21, 28. Williston, Contracts (Rev. ed. 1936) § 647. *Rice* v. *Cunningham,* 116 Mass. 466, 469.

But in this case Lillian A. Kerwin and Ernest W. Kerwin claim under William J. Kerwin. They stand in his shoes. If title passed to Gladys as against William J. Kerwin, it passed to her as against his legatees. When the trust agreements were executed, the property to which they related was already in the possession of Gladys, and most if not all of it stood in her name. Those agreements contemplated the holding by her of the legal title. Under those circumstances no formal delivery of the property itself was necessary to vest the legal title in her. *Creeden* v. *Mahoney,* 193 Mass. 402. *Blackwell* v. *Blackwell,* 196 Mass. 186, 189. *Sullivan* v. *Hudgins,* 303 Mass. 442, 447. 24 Am. Jur., Gifts, § 26.

The trust agreements furnish incontrovertible internal evidence that they were intended to express the whole transaction between Gladys and her father. He covenanted, agreed and declared under seal that he had no right, power or interest in the trust property except such as was set forth

in the trust agreements. The beneficial interest was completely disposed of by giving him an equitable life estate and Gladys the remainder "to her own use and behoof absolutely forever." His apparent purpose to render a will practically unnecessary, and his reserved power to alter, amend or revoke the trust, did not make the trust testamentary in its nature. *National Shawmut Bank* v. *Joy*, 315 Mass. 457, 469–475, 477–478. The reserved power could be exercised only according to its terms, and since there was never even an attempt to exercise it there was no impairment of the rights in remainder given to Gladys. *Kelley* v. *Snow*, 185 Mass. 288, 298. *Coates* v. *Lunt*, 210 Mass. 314. *Clune* v. *Norton*, 306 Mass. 324. *National Shawmut Bank* v. *Joy*, 315 Mass. 457, 462, 474–475. There was no mistake in drafting the trust agreements. Plainly they conformed to the purpose of William J. Kerwin at the time, that of disinheriting his wife. He could hardly have been so obtuse as to fail to see that they disinherited his sons also in plain words.

As matter of law the trust instruments must be taken as intended to accomplish the very purpose of the so called "parol evidence rule," that of fixing beyond all question the rights of the parties to those agreements in accordance with their terms, and to preclude resort to extrinsic evidence apart from exceptional and strictly limited instances of need that are not applicable to this case.[1] As to trusts, a learned author has said, "Under the parol evidence rule, if the manifestation of intention of the settlor is integrated in a writing, that is, if a written instrument is adopted by him as the complete expression of his intention, extrinsic evidence, in the absence of fraud, duress, mistake or other ground for reformation or rescission, is not admissible to

---

[1] *Glackin* v. *Bennett*, 226 Mass. 316. *Boston Consolidated Gas Co.* v. *Folsom*, 237 Mass. 565, 567. *Kilroy* v. *Schimmel*, 243 Mass. 262, 267. *Snider* v. *Deban*, 249 Mass. 59, 61. *Ernest F. Carlson Co.* v. *Fred T. Ley & Co. Inc.* 269 Mass. 272, 276, 277. *Whitty Manuf. Co. Inc.* v. *Clark*, 278 Mass. 370, 374. *Hirsch* v. *Fisher*, 278 Mass. 492, 495. *Kennedy Bros. Inc.* v. *Bird*, 287 Mass. 477, 482. *Graustein* v. *H. P. Hood & Sons, Inc.* 293 Mass. 207, 216. *Bellows* v. *Worcester Storage Co.* 297 Mass. 188, 189, 190. *Norfolk County Trust Co.* v. *Green*, 304 Mass. 406. *Bates* v. *Southgate*, 308 Mass. 170, 172. *State Street Trust Co.* v. *Hall*, 311 Mass. 299, 306. Wigmore, Evid. (3d ed. 1940) § 2425.

contradict or vary it." Scott, Trusts (1939) §§ 38, 164.1. That statement finds support in our decisions. *Moore* v. *Stinson,* 144 Mass. 594, 597. *Crawford* v. *Nies,* 224 Mass. 474, 484, 485. *Coolidge* v. *Loring,* 235 Mass. 220. *Gorey* v. *Guarente,* 303 Mass. 569, 573, 574. *O'Brien* v. *Holden,* 104 Vt. 338, 345, 346. Though often stated in terms of the admissibility of evidence, the so called "parol evidence rule" is really a rule of substantive law. Extrinsic evidence, even though admitted, cannot control the words of a document that purports to express the whole transaction.[1] *O'Malley* v. *Grady,* 222 Mass. 202, 204. *Glackin* v. *Bennett,* 226 Mass. 316, 320. *Pelonsky* v. *Wattendorf,* 255 Mass. 558, 562. *Paulink* v. *American Express Co.* 265 Mass. 182, 185. *Kidder* v. *Greenman,* 283 Mass. 601, 609. *Kesslen Shoe Co. Inc.* v. *Philadelphia Fire & Marine Ins. Co.* 295 Mass. 123, 129. *Higgs* v. *De Maziroff,* 263 N. Y. 473, 92 Am. L. R. 807.

It is true that a written contract or other instrument may be invalidated by extrinsic proof that it was executed as a joke or even in some instances as a pretence, with no intention on the part of either party that it should create any legal right or obligation.[2] Williston, Contracts (Rev. ed. 1936) § 21. *Beaman-Marvell Co.* v. *Gunn,* 306 Mass. 419, 422, 423. *Zell* v. *American Seating Co.* 138 Fed. (2d) 641,

---

[1] "It is not surprising that confusion results from a rule called 'the parol evidence rule' which is not a rule of evidence [and] which relates to extrinsic proof whether written or parol." *Zell* v. *American Seating Co.* 138 Fed. (2d) 641, 643. For the history of the rule, see Wigmore, Evid. (3d ed. 1940) § 2426.

[2] It has also been held that a written contract, though duly executed and delivered to the obligee, may be shown by oral evidence not to have become effective because of the nonperformance of some condition precedent orally attached to its taking effect. *Wilson* v. *Powers,* 131 Mass. 539. *Marr* v. *Washburn & Moen Manuf. Co.* 167 Mass. 35, 38. *Elastic Tip Co.* v. *Graham,* 185 Mass. 597, 600, 601. *Hill* v. *Hall,* 191 Mass. 253, 265. *Diebold Safe & Lock Co.* v. *Morse,* 226 Mass. 342, 344. *Levene* v. *Crowell,* 243 Mass. 441. *Hallett* v. *Moore,* 282 Mass. 380, 395. *Exchange Realty Co.* v. *Bines,* 302 Mass. 93, 95, 96. Apart possibly from deeds of conveyance (*Ward* v. *Lewis,* 4 Pick. 518; *Browning* v. *Haskell,* 22 Pick. 310, 312; *Hubby* v. *Hubby,* 5 Cush. 516, 519; *Buszozak* v. *Wolo,* 125 Misc. (N. Y.) 546; *Reed* v. *Reed,* 117 Maine, 281), it has been held in other jurisdictions that the same rule applies to sealed instruments. *Blewitt* v. *Boorum,* 142 N. Y. 357. *Whitaker* v. *Lane,* 128 Va. 317, 11 Am. L. R. 1157. In *Diebold Safe & Lock Co.* v. *Morse,* 226 Mass. 342, 344, the original papers show that the lease was under seal. See also *Daley* v. *Carney,* 117 Mass. 288; *Bromley* v. *Mitchell,* 155 Mass. 509, 511, 512; *Crowley* v. *Holdsworth,* 264 Mass. 303, 309; Williston, Contracts (Rev. ed. 1936) §§ 210, 212.

644.[1]  We need not decide whether that rule can be extended to sealed instruments, in view of the common law theory that the obligor in such an instrument is conclusively bound by its terms. Williston, Contracts (Rev. ed. 1936) § 205. *Goode* v. *Riley*, 153 Mass. 585, 587. *Mahoney* v. *Emergency Fleet Corp.* 253 Mass. 234. "Where a seal [is] not required for the validity of a contract [it] has been treated as surplusage in order to carry out the expressed intention of the parties through resort to the rules applicable to simple contracts." *Johnson-Foster Co.* v. *D'Amore Construction Co.* 314 Mass. 416, 421. The reason why we need not decide that question is that in our opinion an inference of fact could not properly be drawn that the trust agreements were intended merely as shams. The evident purpose at the time was to disinherit the wife. The husband was careful to reserve the right to revoke the trusts, and revest the trust property in himself. The correct conclusion, we think, is that the trust agreements express the actual intention of the parties at the time.

Even if, notwithstanding the terms of the trust agreements, the remainder passing to Gladys under those agreements might be subjected to a trust in favor of her brothers and Lillian A. Kerwin by proof of an oral promise by Gladys to share the remainder with them (*Ham* v. *Twombly*, 181 Mass. 170, 172, 173; *Beals* v. *Villard*, 268 Mass. 129, 132, 133; compare Scott, Trusts [1939] § 38), the difficulty in this case would be that there is little evidence of such an oral promise. The trust agreements themselves, and all that was said when they were drawn and executed, negative any promise that would benefit Lillian A. Kerwin, for the plain purpose was to disinherit her. Neither was there anything said or done at that time to show a promise to hold for the other children. If there had been such a promise, it would not support the present petition which is brought for the benefit of the estate generally. The only

---

[1] The *Zell* case was reversed in 322 U. S. 709, by a divided court, two justices voting to affirm, four justices holding that recovery by the plaintiff upon the oral addition to the written contract was precluded by the parol evidence rule, and three justices holding the oral addition contrary to public policy.

conduct of Gladys that might be thought to recognize the claim of Lillian A. Kerwin was her promise, jointly with Harold who had no property in his hands, made on October 9, 1940, when their father was in his last illness and mentally disturbed, to "do the right thing" by Lillian. Such a promise by Harold could hardly have reference to a money settlement out of property of his father in his hands, for there was no such property. The promise by Gladys was in identical words. We cannot find that such a vague promise amounted to an understanding to hold for the distributees of the father's estate the remainder given to Gladys by the trust agreements.

At various times after the trust agreements were executed William J. Kerwin made statements indicating that he considered that all the stocks, bonds and bank deposits held by Gladys were really his and would form part of his estate. For example, in 1934 and again in 1938 Ernest told his father that he thought it was unfair to put only fifty shares of the Beacon stock into his name while Gladys and Harold held one hundred fifty shares each. His father denied any unfairness, saying that the stock was all his, and "if anything happened to him we were all to be treated alike." He said that the way the stock was held "didn't mean a thing." In 1940, when William J. Kerwin and his wife opened his safe deposit box and found in it only twenty-five shares of Beacon stock, he told his wife that everything else he owned was in the safe deposit box which was in the name of Gladys, and about the same time he gave his wife a memorandum of securities of the value of about $64,000 that he said he owned. Those securities must have been among those held by Gladys, for he himself held no such amount. Besides, there is his act of November 28, 1936, of ratifying and confirming his will after the bulk of his property had been covered by the trust agreements. A simple explanation of most of this testimony is that Kerwin knew that he had reserved the power to alter, amend or revoke the trust agreements, and concluded that that reserved power left him substantially the master of the trust property. Very likely he intended sooner or later to make

an equitable division of it among his wife and children. But we cannot infer from this testimony any promise on the part of Gladys.

The judge found that the trust agreements "constituted an illusive device to deprive the wife of any substantial interest in her husband's estate as his widow." It has been shown already that that "device" was not "illusory," but was one that fixed the rights of the parties to those agreements. The judge found further that William J. Kerwin, if the trust agreements were intended to be effective, "intended to cheat his wife." He could not "cheat" her in any legal sense by means of those agreements unless she had rights that were paramount to his right to do what he pleased in his lifetime with his own personal property.

The right of a wife to waive her husband's will, and take, with certain limitations, "the same portion of the property of the deceased, real and personal, that . . . she would have taken if the deceased had died intestate" (G. L. [Ter. Ed.] c. 191, § 15), does not extend to personal property that has been conveyed by the husband in his lifetime and does not form part of his estate at his death. *Fiske* v. *Fiske*, 173 Mass. 413, 419. *Shelton* v. *Sears*, 187 Mass. 455. In this Commonwealth a husband has an absolute right to dispose of any or all of his personal property in his lifetime, without the knowledge or consent of his wife, with the result that it will not form part of his estate for her to share under the statute of distributions (G. L. [Ter. Ed.] c. 190, §§ 1, 2), under his will, or by virtue of a waiver of his will. That is true even though his sole purpose was to disinherit her. *Leonard* v. *Leonard*, 181 Mass. 458. *Kelley* v. *Snow*, 185 Mass. 288, 299. *Redman* v. *Churchill*, 230 Mass. 415, 418. *Roche* v. *Brickley*, 254 Mass. 584, 588. *Malone* v. *Walsh*, 315 Mass. 484, 490, 491. *Beirne* v. *Continental-Equitable Title & Trust Co.* 307 Penn. St. 570. *Rynier Estate*, 347 Penn. St. 471. Scott, Trusts (1939) § 57.5. 26 Am. Jur., Husband & Wife, § 198. So far as it may conflict with the foregoing decisions, the case of *Brownell* v. *Briggs*, 173 Mass. 529, is no longer controlling. The right of a wife as distributee stands no higher than the similar right of a child.

*Chase* v. *Redding,* 13 Gray, 418, 422. *Marshall* v. *Berry,* 13 Allen, 43, 47. *Rolfe* v. *Clarke,* 224 Mass. 407. *Harding* v. *Bailey,* 306 Mass. 108.

The limitation found in some of our cases upon the right of a husband to disinherit his wife by a conveyance or gift of personal property inter vivos, that the conveyance or gift must not be "colorable" (*Kelley* v. *Snow,* 185 Mass. 288, 299; *Roche* v. *Brickley,* 254 Mass. 584, 588), means merely that the conveyance or gift must be one legally binding on the settlor or donor, accomplished in his lifetime, and not testamentary in its effect. In other words, it must be an actual conveyance or gift. *Potter Title & Trust Co.* v. *Braum,* 294 Penn. St. 482, 64 Am. L. R. 463. In *Newman* v. *Dore,* 275 N. Y. 371, 112 Am. L. R. 643, complete control of the trustee, reserved to the settlor, was held to make testamentary and invalid a settlement designed to disinherit his wife. See also *Krause* v. *Krause,* 285 N. Y. 27; *Brown* v. *Crafts,* 98 Maine, 40, 45. The soundness of that ground was recently left open by us in *National Shawmut Bank* v. *Joy,* 315 Mass. 457, 476. In the present case no such control was reserved.

Cases are not in point that hold invalid a conveyance by a husband to defeat a possible decree for the support of his wife. *Shepherd* v. *Shepherd,* 196 Mass. 179. *Doane* v. *Doane,* 238 Mass. 106, 112. *Caines* v. *Sawyer,* 248 Mass. 368, 374. 26 Am. Jur., Husband & Wife, § 197. Neither are cases holding invalid a gift made by a husband for the purpose of reducing the share of his estate to which his wife is entitled under an antenuptial contract. *Eaton* v. *Eaton,* 233 Mass. 351, 369, et seq. Nor are cases in which a woman married a man of supposed means in ignorance of the fact that on the eve of marriage he had conveyed away all his property for the purpose of defeating her expectations. *Gedart* v. *Ejdrygiewicz,* 305 Mass. 224. *LeStrange* v. *LeStrange,* 242 App. Div. (N. Y.) 74. *Collins* v. *Collins,* 98 Md. 473. *Kirk* v. *Kirk,* 340 Penn. St. 203. *Hanson* v. *McCarthy,* 152 Wis. 131. 26 Am. Jur., Husband & Wife, §§ 185–195.

The judge was right in ordering, upon the petition brought

by Lillian A. Kerwin, a conveyance to the executors of the Beacon and Dexdale stocks. Even if the actually innocent wife could be affected by the fraudulent purpose of her late husband in holding those stocks in the name of his daughter Gladys, the wife has made out her case without reliance upon any fraud. *Harvey* v. *Varney,* 98 Mass. 118. *Stillings* v. *Turner,* 153 Mass. 534. *Lufkin* v. *Jakeman,* 188 Mass. 528. *Murphy* v. *Moore,* 228 Mass. 565, 568. *O'Gasapian* v. *Danielson,* 284 Mass. 27, 34. *Paula* v. *Soares,* 304 Mass. 450. *Zak* v. *Zak,* 305 Mass. 194. *Levy* v. *Levy,* 309 Mass. 486, 491. *Braga* v. *Braga,* 314 Mass. 666, 672.

But the other findings and orders contained in the final decree upon that petition are to be struck out. As so modified that decree is affirmed. There was no error in the final decree dismissing the petition brought by Gladys M. Donaghy and others, executors. Discussion of that petition is unnecessary. The final decree dismissing it is affirmed.

*So ordered.*