**In re Anthony J. NARDONE and Linda M. Nardone, Debtors.**

**Bankruptcy No. 86–40010–G.**

United States Bankruptcy Court, D. Massachusetts.

Jan. 23, 1987.

Bernard P. Rome, Rome, George & Vogler, Boston, Mass., for Linda Sarro.

George R. Desmond, Framingham, Mass., for debtors.

Joseph M. Szabo, Boston, Mass., for Chapter 13 trustee.

## OPINION

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

This disputed claim arises by reason of a transaction in which Linda A. Sarro (the "Claimant") purchased a 25% interest in a corporation partially owned and controlled by Anthony J. Nardone ("Mr. Nardone"), who with his wife, Linda M. Nardone, are the debtors in this Chapter 13 case (the "Debtors"). The Claimant asserts a secured status by reason of a real estate attachment obtained when she brought suit on the claim in the state courts prior to the Debtors filing their Chapter 13 petition with this Court.

Through an oral stipulation placed on record by the Court at trial, the claim has been tried in this Court on three alternative theories: indebtedness due for a loan; fraud or misrepresentation; and breach of contract. A fourth theory, based upon MASS.GEN L. ch. 93A, was included in the state court complaint but was waived at trial here. We shall separately treat each of the theories relied upon by the Claimant. Many of the Court's findings of fact (which consist of all factual statements made in this opinion, whether or not designated as findings) are included with the discussion of the applicable legal principles. We first give some background.

In June of 1982, G.M.J. Associates, Inc. (the "Corporation") acquired a franchised business known as Women's World Health Spa. The stock of the Corporation was owned by Mr. Nardone and one Gerald Pacelli, apparently in equal amounts. The Claimant met the Debtors in August 1982. She expressed a desire to purchase an interest in the Corporation. After several discussions, the Claimant and Mr. Nardone (signing for the Corporation) entered into an agreement on October 8, 1982. That agreement, and the conversations of the parties preceding it, form the basis for this claim.

The October 8, 1982 agreement (the "Agreement") is quite ambiguous, as will be later discussed. It suffices to say here that in it the parties agreed to the Claimant purchasing a 25% interest in the Corporation at a price of $27,900. The Claimant paid $10,000 at the signing of the Agreement and $17,900 on December 16, 1982. The Agreement states that no shares of stock were transferred to her at the signing because certificates representing the outstanding capital stock of the Corporation were then pledged to secure indebtedness resulting from the purchase of the business the previous June. The Agreement provided that certificates representing a 25% interest would be issued to the Claimant at the termination of the pledge. No such certificates were ever issued to the Claimant. The Claimant entered the Corporation's employ, and the Corporation continued in business until December of 1984, when it was forced to terminate oper-

ations because of financial difficulties. The Claimant's state court law suit and Debtors' Chapter 13 case followed.

## I. FRAUD OR MISREPRESENTATION

The Claimant alleges that the decision to invest in the Corporation was based upon several false statements orally made to her by Mr. Nardone prior to the signing of the Agreement. The Agreement itself contains few representations. It has no clause which purports to make it the repository of all representations of the parties.

 The Claimant first complains about a statement made to her by Mr. Nardone to the effect that the Corporation was worth $100,000 to $105,000. Mr. Nardone admits that he said this. His statement is not, however, actionable even if the Corporation was actually worth less. It is the classic statement of an opinion. Normally, only misstatements of fact can support an action for fraud or misrepresentation. *Saxon Theatre Corp. of Boston v. Sage*, 347 Mass. 662, 200 N.E.2d 241 (1964). Although an opinion on value may be actionable if it is based on facts known only to the person expressing the opinion, *John A. Frye Shoe Co. v. Williams*, 312 Mass. 656, 46 N.E.2d 1 (1942), such is not the case here. The Claimant could have used independent sources to determine the value. She could have talked to the prior owner or the franchisor, or she could have conducted her own appraisal. If Mr. Nardone's statement about value was inaccurate, it was not reasonable for her, as a prospective investor, to rely only on his opinion.

 It is of course true that an opinion itself may be a fact, so that in theory a representation by a party that he holds a certain opinion when he does not would itself be actionable. *Wire & Textile Machinery v. Robinson*, 332 Mass. 417, 125 N.E.2d 403 (1955). The Claimant's case, however, falls short of proving that Mr. Nardone did not believe the Corporation was worth this amount. Her evidence consists of showing that the business had been purchased two months before for $65,000, and that it was not profitable during the

summer of 1982. At the trial, Mr. Nardone reaffirmed his belief that the Corporation was worth that amount in August and September of 1982. I find that he did not misrepresent that belief to the Claimant.

 Mr. Nardone also made statements to the effect that the Corporation was profitable. Unlike his statement of value, these were representations of fact. The Court finds, however, that these statements were not false. It is, first of all, most likely that Mr. Nardone was referring to the operations of the business under its prior owner, in view of the short duration of his ownership at the time. The prior owner of the business testified that the business had been profitable under her ownership, and I so find that fact. The business was operating at a loss during the period of August and September of 1982; however, these were among its slowest months. A reference to the profitability of a business would, logically, refer to a full year's cycle. The Corporation was in fact profitable for at least a full year following the Claimant's purchase of her 25% stock interest. She in fact participated in a distribution of its profits that first year.

 The Claimant also relies upon a statement in the Agreement that "no taxes are presently due." On October 12, 1986, shortly after the Agreement was signed and money transferred, the Corporation made a $1,641.62 payment for payroll taxes applicable to the previous calender quarter. Even if these payroll taxes for the quarter ending September 30th were due at the time of the signing of the Agreement, they were certainly not overdue. I find that the tax clause in the Agreement was not intended to refer to such currently payable payroll taxes, but rather to overdue taxes. Currently payable payroll taxes are in the nature of currently payable liabilities to trade creditors. They are a common liability which reasonable business people will expect a business to have, and which would not normally be the subject of a tax clause in a sales agreement.

■ The Claimant asserts that an oral representation was made to her in August or September of 1982 that the Corporation had no prior obligations, and that this was not true. I find that no such statement was made. Moreover, all that has been shown is that the Corporation paid some recent bills with funds obtained from the Claimant in October of 1982. Any indebtedness in existence at the time of the parties' conversation in August and September was minimal; thus, even if the statement was made, the obligations were so *de minimus* that the statement was essentially true.

■ Claimant also asserts a claim for fraud and misrepresentation against Mrs. Nardone. She asserts that Mrs. Nardone adopted and assented to the misrepresentations by Mr. Nardone because Mrs. Nardone was present at the conversations between the parties and failed to object to the statements. This reasoning is tenuous and the theory is questionable. We decline, however, to address the theory's merits. Because of the Court's ruling concerning Mr. Nardone's statements, there were no fraudulent statements or misrepresentations for Mrs. Nardone to adopt.

## II. BREACH OF CONTRACT

■ The Agreement was between the Claimant and the Corporation. It is entitled "Assets Purchase and Partnership Agreement." It was neither. It involved a purchase by the Claimant of a 25% stock interest in the Corporation. Whether that 25% interest was to come from outstanding stock or from stock to be issued by the Corporation is, to say the least, cloudy. Consider, for example, the following sentence: "The said G.M.J. shall transfer the right, title and interest to twenty five percent (25%) of the outstanding shares of corporate stock immediately upon the execution of this Agreement." How the Corporation, as opposed to its stockholders, could transfer outstanding stock is left unexplained. Resolution of this question, however, is not necessary. All parties treated the Claimant as a 25% stockholder

after her payment in full, notwithstanding this ambiguity of the Agreement and notwithstanding the absence of a stock certificate in her name.

The Agreement, which was signed by Mr. Nardone on behalf of the Corporation, provided in part: "It is agreed that all profits or losses sustained prior to the execution of this Agreement shall be distributed to or borne by Anthony J. Nardone." This clause created a personal obligation on the part of Mr. Nardone. Even though the Corporation and not he was a party to the Agreement, the clause pertained to him personally; his signature on the Agreement, even on behalf of the Corporation, is a clear indication of his assent to this obligation. The Corporation was in fact losing money during August and September. It had some back bills. It used the $10,000 given it by the Claimant on October 8, 1982, to pay these back bills. The Claimant asserts that this was in violation of the requirement that prior "losses" be borne by Mr. Nardone.

The provision is nevertheless fraught with ambiguity. In view of the fact that any "losses" sustained by the Corporation prior to the Claimant's purchase would necessarily be reflected in its financial condition at the time of the purchase, how were these losses to be "borne by" Mr. Nardone? Was he to make a capital contribution in the amount of the losses? Or did the provision seek only to assure the Claimant that she would not bear any personal obligation for the losses? The later interpretation is certainly a possibility in this poorly drafted agreement which continuously uses the terms "partnership" and "partners" in describing a transaction involving the sale of stock in a corporation.

We need not, however, resolve this mindless ambiguity. I find that there were in fact no prior "losses" within the meaning of the clause. The business of the Corporation, a so-called health spa, was operated indoors. It was a seasonal business; the summer was a slow period. Its seasonal nature was discussed by the parties. I find that they did not intend the clause to refer

to operating losses incurred during the summer. The clause was intended to refer to losses incurred during the period of a full year. This is so even though Mr. Nardone had owned the business only a few months. The clause was intended to insulate the Claimant from all such prior annual losses in the business, whether incurred under Mr. Nardone's or anyone else's ownership.

The Claimant would have the Court interpret the clause to mean that none of the funds contributed by her to the Corporation would be used to pay corporate debts existing on October 8, 1982. The Agreement does not say this, and the Claimant does not claim that Mr. Nardone said it. Moreover, even if such an agreement had been made, its admissibility into evidence would have to overcome the obstacle of the parole evidence rule. *E.g., Kerwin v. Donaghy*, 317 Mass. 559, 59 N.E.2d 299 (1945).

■ The Claimant also alleges that Mr. Nardone breached his oral agreements that he and Mrs. Nardone would work in the business. I find that neither of the Debtors promised to spend any substantial amount of time running the business. Mr. Nardone has a full time job which he did not promise to give up, and Mrs. Nardone is a mother with young children at home.

### III. LOAN

■ The Claimant, in her proof of claim filed with the Court, also alleges an alternative theory that she loaned the Debtors $27,900. This theory is apparently based on the fact that she never received her stock certificate. No matter what its basis, the theory has no validity. Apparently recognizing this, the Claimant did not press the theory at trial.

The funds, first of all, were loaned to the Corporation. It is true, as shall be discussed later, that $17,900 never reached the Corporation. But the one thing the Agreement is clear on is that the funds were intended by the parties to go to the Corporation. Thus, any loan made could

only have been made to that entity, not to the Debtors.

Moreover, the Claimant's payments were clearly for the purchase of a stock interest, not a loan. The Agreement does not characterize the transaction as a loan, and we rule that no loan occurred.

### IV. BREACH OF FIDUCIARY OBLIGATION

■ The stipulation placed on the record as to the Claimant's legal theories did not include breach of a fiduciary obligation. The Claimant nevertheless seemed to try her case in part upon such a theory. Because of this direction at trial, and because the Court concludes that the Claimant may not pursue such a cause of action, it seems wise to rule upon this issue as well. The Court also has in mind that the stipulation was dictated by the Court rather than by counsel, so that there is perhaps the danger of some deference on the part of counsel to the wording of the stipulation.

The Claimant complains that Mr. Nardone and Mr. Pacelli divided her $17,900 payment of December 12th between them rather than turning it over to the Corporation. By Mr. Nardone's own admission, this was indeed done. The Claimant calls this larceny and a breach of Mr. Nardone's fiduciary obligations. She points to the Agreement which required the funds to go to the Corporation. She asserts, and the Court so finds, that there was no disclosure to her that the funds were to be so used, and certainly no consent on her part as a stockholder.

Mr. Nardone testified that for tax purposes he treated his share of the $17,900 as a return of capital, a partial sale of his stock interest. It is nevertheless clear from the Agreement that the funds were to go to the Corporation, and that once the Claimant paid the total $27,900, she was thereafter a 25% stockholder. Mr. Nardone may, understandably, have been confused by the Agreement into thinking that he was selling a part of his stock interest. In a sense, of course, he was, but only in

the sense that his stock interest was being diluted by the new shares to be issued by the Corporation. The ambiguous provisions in the Agreement postponing issuance of stock to the Claimant until Mr. Nardone's certificates were released from pledge were apparently intended for convenience. These provisions were apparently included because the parties desired that all stockholders obtain possession of their certificates at the same time.

A corporate distribution to only two of the three stockholders was a wrongful diversion of corporate funds. *See Bessette v. Bessette,* 385 Mass. 806, 810, 434 N.E.2d 206, 208 (1982); *Donahue v. Rodd Electrotype Co. of New England, Inc.,* 367 Mass. 578, 593–94, 328 N.E.2d 505, 515–16 (1975). Unfortunately for the Claimant, however, the Supreme Judicial Court of Massachusetts has ruled that a cause of action based upon such a diversion belongs to the corporation alone and not to a nonparticipating stockholder. A stockholder asserting such a claim must do so in a derivative action for the benefit of the corporation. *Bessette v. Bessette,* 385 Mass. 806, 434 N.E.2d 206 (1982).

### V. CONCLUSION

Except for the matter of fiduciary obligations concerning Mr. Nardone's appropriation of part of the $17,900, this case, in essence, is an attempt to recoup a bad investment in the courts. It is not even clear that the investment was a bad one at the outset, because the Corporation was initially profitable. At any rate, the Claimant made no attempt to protect herself. She did not investigate the financial condition or business prospects of the Corporation. She did not hire a lawyer to represent her in the negotiation and drafting of the Agreement. If she had hired a lawyer for this purpose, and if in fact the condition of the Corporation at the time of her purchase fell short of her expectations, those expectations could perhaps have been protected by rather standard representations concerning financial conditions commonly found in such agreements. Her lawyer

might have been successful in having the Agreement reduce to specific factual statements the oral opinion given her concerning the Corporation's value and the general factual representations made to her as to its profitability. The Agreement might also have set forth specific obligations as to the use of her funds and the services to be performed for the Corporation by the various stockholders. All of this is, of course, pure speculation and not germane to the present controversy. The claimant has suffered an unfortunate loss. Courts cannot, however, remedy all misfortunes. The Debtors, in view of their status in this Court, have also had their share of misfortune.

The claim is denied.

SO ORDERED.