## CEM SECURITIES CORPORATION v. UNITED STATES.

### No. 45321.

Court of Claims.

May 1, 1944.

J. Marvin Haynes, of Washington, D. C., for plaintiff.

J. W. Hussey, of Washington, D. C., and Samuel O. Clark, Jr., Asst. Atty. Gen. (Robert N. Anderson and Fred K. Dyar, both of Washington, D. C., on the brief), for defendant.

Before WHALEY, Chief Justice, BOOTH, Chief Justice (retired), recalled, and LITTLETON, WHITAKER, and MADDEN, Judges.

MADDEN, Judge.

Plaintiff, in its income-tax return for the year 1933, claimed a bad-debt deduction of $115,500 because of a charge-off in that year as worthless of a note of one Utech for that amount which plaintiff held, and a business loss of $32,369.13 occasioned by the sale of 1,000 shares of stock to one Amberg

for that amount less than the cost of the stock to plaintiff. The Commissioner of Internal Revenue disallowed the bad-debt deduction entirely, and partially disallowed the loss on the sale of the stock, reducing that loss to $19,619.13. Plaintiff paid the taxes as computed by the Commissioner, filed a claim for refund and, upon its disallowance, brought this suit.

The Government's defense as to the bad debt deduction is that the Utech note, charged off by plaintiff as worthless in 1933, was worthless when made in November 1932, and that the charge-off should have been taken in that year, if at all. The facts of the transaction are fully set forth in the findings, and a full recital of them will not be given here. In brief they are as follows: In 1929 Utech purchased 2,-200 shares of common stock of the Crown Cork and Seal Company, which company was controlled by plaintiff. Utech was a close personal friend of Charles E. McManus, the principal stockholder of Crown, and of Leroy W. Baldwin, president of the Empire Trust Company. To make the purchase, Utech borrowed $147,000 from Empire, and pledged the Crown stock as collateral. In January 1930 the Crown stock had declined in value, Empire was calling for additional collateral, and plaintiff loaned Utech 1,000 shares of Crown which Utech pledged to Empire. Later in 1930 and in 1931 plaintiff loaned, at various times, a total of 4,500 additional shares of Crown to Utech for the same purpose. Plaintiff was the owner of about 150,000 shares of Crown stock during this time, and was interested in maintaining the market price of the stock. It made the additional loans of Crown to Utech to prevent Empire from selling Utech's 2,200 shares, as Empire was threatening to do, because of the adverse effect which such a sale might have had on the market price of the stock.

In 1931 and 1932 the price of the stock continued to decline and by April 1932, all of the Crown stock, 7,700 shares, pledged with Empire on the Utech loan, was worth $75,000 less than the amount of the loan. Empire was demanding additional collateral from Utech and the plaintiff. On November 7, 1932, Utech wrote McManus that Empire had given him notice that it was going to sell the Crown stock and that Utech was helpless to prevent it. The Crown stock was at that time quoted at $21 per share, so that the 7,700 shares had a market value of $161,700. Utech's loan with accrued interest amounted to $150,679.07. Utech had another note with Empire for $25,000, secured by shares of various stocks other than Crown, which in November 1932 had a market value of about $23,000. Most of these stocks belonged to Utech's wife, but the plaintiff's officers were not aware of that fact.

On November 19, 1932, in order to get back its 5,500 shares of Crown stock, and to prevent Empire from putting Utech's 2,200 shares on the market, plaintiff loaned Utech $115,500, the market value of plaintiff's 5,500 shares, on Utech's unsecured demand note bearing interest at 5%. Utech turned the money over to Empire, together with $10,089.86 of his own money, as a payment on his $147,000 note and its accrued interest; thus reducing that note to $25,089.21. That balance was consolidated with Utech's other note for $25,-000, and Utech gave a new note to Empire for $50,089.21, secured by his 2,200 shares of Crown stock and the other stock which had been pledged on his $25,000 note. At this time the market value of all this collateral was $69,720.75. Plaintiff believed that the market price of all these stocks would increase to an amount sufficient for Utech to pay both the Empire note and plaintiff's note for $115,500. At the time this rearrangement of the affairs of Utech, the plaintiff, and Empire was made, Empire's president told Utech that the collateral was now adequate, and that Empire would not make further demands on the note unless the bank examiners compelled it to do so. In the spring of 1933, however, Empire informed Utech that it was compelled to collect his note in order to improve the liquidity of its condition. During or shortly prior to June 1933, it sold Utech's 2,200 shares of Crown, and 33 shares of another stock which was among those pledged to it by Utech, realizing more than enough from these sales to pay Utech's note to it. It returned the unsold collateral to Utech, and also the excess money. Utech used the money in the stock market in an effort to make a profit, but lost the money. During June 1933, that is, within approximately one month after Empire had sold or returned the collateral on the Utech note, the various shares of that collateral were quoted on the Exchange at prices which would have produced a total price of $180,556, or more than enough to pay both the Empire note for $50,089.21 and the plaintiff's note for $115,500. These quoted

prices were, in general, maintained or exceeded during the following few years, as is shown in finding 13.

When the plaintiff learned that Empire had sold some of the Utech collateral and returned the rest to Utech, together with the excess cash realized on the sale, it demanded payment of his note for $115,500 to it. Utech made no such payment. The plaintiff then concluded, after further investigation, that Utech was financially irresponsible and that the note was worthless. It charged the note off as a bad debt in 1933. It filed no suit to collect the note at that time, thinking that a judgment would be uncollectible. It made demands for payment during the years 1934 to 1938, and filed a suit just before the statute of limitations would have run. That suit was dismissed upon the execution by Utech of a new demand note for $115,500 upon which no payments have been made.

■ We think the plaintiff was entitled to charge off the Utech note in 1933 as a bad debt, and that the Government's claim that the note was worthless in November 1932 when given, is not valid. Utech could not have paid the note in full, at the time he gave it, out of his assets at their then market value. But he did find some $10,000 at that time to pay on his note to Empire, and he left collateral with Empire on his remaining indebtedness to it which was substantially in excess of that indebtedness. He seemed to the plaintiff, therefore, to have resources which could and would be used to make payments on plaintiff's note after the collateral shares had made a further recovery, which plaintiff expected, not unreasonably, that they would do. In fact, if Empire had waited only one month longer to sell the Utech collateral, and had happened to sell it at the high prices of that month, June 1933, the proceeds of the sale and the returned collateral would have considerably more than paid Utech's notes to Empire and to the plaintiff. Since the plaintiff in 1932 expected that these increases would occur somewhat as they did occur, it could not honestly have charged off Utech's debt to it as bad, at that time. In 1933, however, Utech lost his Crown stock, so that he could no longer gain by increases in its market value. He failed to apply the excess cash turned over to him by Empire, to reduce the plaintiff's note. He failed to give the plaintiff the security of the excess collateral which Empire had turned back to him. The plaintiff then concluded that Utech's note was uncollectible, and again subsequent events have shown that that conclusion was correct. We think the plaintiff was entitled to the bad debt deduction which it attempted to take in 1933, and should win that phase of its suit.

As to the sale to Amberg, upon which the plaintiff claimed a deductible loss for 1933, which the Commissioner disallowed, the facts are these. In 1929 the plaintiff bought 1000 shares of Crown stock for $42,369.13. In 1932 the plaintiff gave an oral option to one Amberg, a partner in a New York Stock Exchange firm, to purchase 1000 shares of Crown stock at $10 a share, the price at which the stock was then quoted on the Exchange. No time limit was placed on the option. On March 20, 1933, Amberg called for the stock and it was sold to him for $10,000. On that date Crown stock was quoted on the Exchange at $22.-75. When the plaintiff gave the option, it owned 154,000 shares of Crown and was trading from time to time in it. During 1933 the plaintiff sold, in addition to the 1000 shares sold to Amberg, 13,450 shares of Crown and reported a net profit of more than $200,000 from such sales in its income tax return. The reason for the plaintiff's giving Amberg the option was that he had in the past, and the plaintiff expected that he would in the future, publicize the Crown stock orally and by giving out literature concerning it to prospective customers.

■ The plaintiff in its income tax return for 1933 claimed as a business loss the difference between the $42,369.13 which it paid for the stock in 1929 and the $10,-000 which it received from Amberg in 1933. The Commissioner of Internal Revenue determined that the allowable loss was only the difference between the cost of $42,369.-13 and the price at which the stock would have sold on the Exchange on the day of the sale to Amberg, which was $22,750, or $22.75 per share. We think the Commissioner was right. When the plaintiff gave to Amberg, without any legal consideration for it, an option to purchase the stock at a fixed price, in the future, it was entering into a bargain from which it could not possibly make a profit, and from which it might, as it did, suffer considerable loss. The plaintiff, as we have seen in our discussion of the Utech note transaction, expected Crown to increase in value, so that it must have anticipated not only a possible, but a probable loss. We think that one who enters into such an arrangement does

so with the intention of making a gift to the optionee of the difference between the option price and the readily ascertainable market price at the time the option is exercised. The option is, then, a combination of a promise to sell and a promise to make a gift. And the transfer, when it occurs, is a combination of sale and gift. To the extent to which the transfer to Amberg was a gift, i. e. to the extent of $12,750, it did not represent a business loss to the plaintiff, but an intentional donation by the plaintiff to Amberg. The reason for the donation was that Amberg had done favors for plaintiff in the past and the plaintiff expected that he would continue to do so in the future. This reason, not amounting to legal consideration, is not material. There is always a reason for a gift. It may be affection, relationship, hope of future favors, or something else. But it is still a gift. What we have said disposes of the plaintiff's argument that the uncompensated value of the stock at the time it was transferred to Amberg should be regarded as an advertising cost or business expense, and therefore deductible as such, if not as a loss on the sale of the stock. Here the favors, which were the reason for the gift, had been done for the plaintiff by Amberg during an unspecified number of past years, and were hoped for by the plaintiff for an unspecified time in the future. For this reason, if not for others which we do not stop to discuss, the plaintiff may not charge this portion of its loss as a 1933 business expense.

The plaintiff may recover upon the item of its claim which relates to the Utech note, with interest. Entry of judgment will await the filing of a stipulation as to the amount.

It is so ordered.

WHALEY, Chief Justice, and BOOTH, Chief Justice (retired), recalled, concur.

WHITAKER, Judge (concurring in part and dissenting in part).

I think the plaintiff is entitled to deduct the difference between the purchase price of the stock of the Crown Cork & Seal Company and the price for which it was sold to Max Amberg.

The majority opinion states that there was no consideration for the option given Amberg to purchase this stock at $10 a share. This does not seem to me to be true. Amberg had rendered services to the plaintiff in times past and it was desired that he should render services to it in the future in the way of publicizing the stock of the Crown Cork & Seal Company, of which plaintiff was a heavy holder, and in boosting its value. This was the actual and I think a sufficient consideration for the option.

But whether or not the option was legally binding, plaintiff felt itself obliged to honor it in order to induce Amberg to continue to boost the stock; in other words, it felt compelled to sell Amberg the stock for $10 a share and it actually did so. Therefore, it is unquestionably out of pocket the difference between what it paid for the stock and what it sold it for.

If a man enters into an unenforceable agreement to sell a piece of property at an agreed price and, although the market for the property advances in the meantime, he nevertheless carries out his agreement merely as a matter of honor, he is bound to take the actual sale price as the basis in determining gain or loss.

Even though it properly can be said that plaintiff gave Amberg the difference between the market value of the stock and the price fixed in the option, I still think plaintiff is entitled to deduct the difference between the cost and the price for which it actually sold the stock, because this, concededly, was done both for his past services in boosting the stock and to induce him to continue to do so. Plaintiff held a great deal of this stock and was constantly trading in it. Keeping up the value of the stock was a part of plaintiff's business, which it thought it could promote by inducing Amberg to continue to boost it. The transaction, therefore, might be viewed in the same light as gifts to customers and the expenses of entertaining them in order to retain their goodwill and business.

The Board of Tax Appeals (now The Tax Court) has held that both gifts to customers and the expenses of entertaining them are deductible. Appeal of James F. Coleman, 3 B.T.A. 835; Adler Co. v. Commissioner, 10 B.T.A. 849; Flanagan v. Commissioner, 47 B.T.A. 782; Hartford Hat & Cap Co. v. Commissioner, 7 B.T.A. 714.

The Second Circuit Court of Appeals has held that entertainment expenses are deductible. Schmidlapp v. Commissioner, 96 F.2d 680, 118 A.L.R. 297; Blackmer v. Commissioner, 70 F.2d 255, 92 A.L.R. 982; Cohan v. Commissioner, 39 F.2d 540.

A taxpayer is entitled to deduct a bonus paid employees, not because the corporation was under the obligation to pay the bonus, but because it was done in order to improve the efficiency and productivity of employees. The sale to Amberg at this low price was done for the same reason. Both the Commissioner's regulations and the decisions of the Board of Tax Appeals recognize the right of the taxpayer to deduct bonuses to employees. Appeal of Boericke & Runyon, 3 B.T.A. 684; Ferry Market, Inc., v. Commissioner, 5 B.T.A. 167; Ketcham v. Commissioner, 9 B.T.A. 1208; Liberty Hosiery Mills v. Commissioner, 31 B.T.A. 64; Guitar Trust Estate v. Commissioner, 34 B.T.A. 857; Regulations 103, sec. 19.23(a)–8.

Although I think the taxpayer would have been entitled to the deduction as a business expense, it cannot recover on this ground in this case, since it did not base its claim for refund on this ground. Real Estate Land-Title & Trust Co. v. United States, 309 U.S. 13, 60 S.Ct. 371, 84 L. Ed. 542. However, I am of the opinion that it can deduct it on the ground it asserted in its claim for refund, to wit, as a loss.

I concur in the majority opinion on the deductibility of the bad debt.

LITTLETON, Judge, concurs in the foregoing opinion.