WINTHROP M. CRANE III AND KATHERINE L. W. CRANE, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 518-64—520-64, 528-64. Filed January 28, 1966.

---

[1] Proceedings of the following petitioners are consolidated herewith: Arthur E. Crane and Cooley G. Crane, docket No. 519-64; Laurence R. Connor and Elizabeth M. Connor, docket No. 520-64; and Winthrop M. Crane, Jr., and the Estate of Ethel E. Crane, First Agricultural National Bank of Berkshire County, Executor, docket No. 528-64.

*Jesse R. Fillman* and *Laura Lou Muckerheide*, for the petitioners.
*J. Frost Walker, Jr.*, for the respondent.

OPINION

DAWSON, *Judge:* Deficiencies in income taxes have been determined by respondent against the petitioners as follows:

| Docket No. | Petitioners | Year | Deficiency |
|---|---|---|---|
| 518-64 | Winthrop M. Crane III and Katherine L. W. Crane | 1959 | $9,422.88 |
| 519-64 | Arthur E. Crane and Cooley G. Crane | 1959 | 10,038.80 |
| 520-64 | Laurence R. Connor and Elizabeth M. Connor | 1959 | 8,206.50 |
| 528-64 | Winthrop M. Crane, Jr., and the Estate of Ethel E. Crane, First Agricultural National Bank of Berkshire County, executor. | 1959 | 325.05 |

These dockets were consolidated for hearing and opinion. In docket No. 528–64, petitioners claim an overpayment in the amount $1,453.50. The issue raised in paragraph 4(e) of the petition in docket No. 528–64 has been settled by the parties, thus leaving for our consideration two questions: (1) Whether respondent erred in disallowing as a long-term, rather than a short-term, capital gain the amounts realized on the sale of certain corporate stock and (2) whether the petitioners in docket No. 528–64 should be taxed on the dividend income paid to the other petitioners herein.

All of the facts were stipulated and are so found.

Winthrop M. Crane III and Katherine L. W. Crane are husband and wife residing in Dalton, Mass. For the taxable year ended December 31, 1959, they filed a joint Federal income tax return with the district director of internal revenue at Boston, Mass. Winthrop M. Crane III is a son of Winthrop M. Crane, Jr., and Ethel E. Crane.

Arthur E. Crane and Cooley G. Crane are husband and wife residing in Dalton, Mass. For the taxable year ended December 31, 1959, they filed a joint Federal income tax return with the district director of internal revenue at Boston, Mass. Arthur E. Crane is a son of Winthrop M. Crane, Jr., and Ethel E. Crane.

Laurence R. Connor and Elizabeth M. Connor are husband and wife residing in Pittsfield, Mass. For the taxable year ended December 31, 1959, they filed a joint Federal income tax return with the district director of internal revenue at Boston, Mass. Throughout

the taxable year ended December 31, 1959, Laurence R. Connor was president of the Agricultural National Bank of Pittsfield.

Winthrop M. Crane, Jr., resides in Dalton, Mass. For the taxable year ended December 31, 1959, he and his wife, Ethel E. Crane, now deceased, filed a joint Federal income tax return with the district director of internal revenue at Boston, Mass. Winthrop M. Crane, Jr., is the father of Winthrop M. Crane III and Arthur E. Crane. Ethel E. Crane, now deceased, was the mother of Winthrop M. Crane III and Arthur E. Crane.

For a number of years prior to 1950 and at the time the agreement of January 10, 1950, referred to in the next paragraph, was executed, Winthrop M. Crane, Jr., his wife Ethel Eaton Crane, and Laurence R. Connor were shareholders of the Eaton Paper Corp. Crane, Jr., and Laurence R. Connor were also directors of the corporation. Winthrop M. Crane III and Arthur E. Crane owned some shares of Eaton Paper Corp., as did their wives, but they held no office with the corporation, both being full-time employees of the Crane Paper Co., an unrelated corporation. At this time the outstanding stock of the Eaton Paper Corp. was in the hands of not more than 250 individual people and was traded from time to time on the over-the-counter market generally in less than round lots. Voting control of the corporation did not rest with any one family or group at the time although the Eaton, Crane, and Connor families held about 35 percent of the voting stock. Just under 40 percent of the stock was held by two other families connected with the management of the Eaton Paper Corp. A Boston broker unrelated to the Eaton-Crane-Connor interests had been acquiring small amounts of the stock from time to time as it appeared on the market. He held less than 2 percent of the stock in January 1950.

On January 10, 1950, Winthrop M. Crane, Jr., the Agricultural National Bank of Pittsfield, Winthrop M. Crane III, Arthur E. Crane, and Laurence R. Connor executed an agreement which read as follows:

THIS AGREEMENT by and between THE AGRICULTURAL NATIONAL BANK OF PITTSFIELD, TRUSTEE, WINTHROP M. CRANE, JR., of Dalton, Massachusetts, and LAURENCE R. CONNOR, of Pittsfield, Massachusetts, WINTHROP M. CRANE III and ARTHUR E. CRANE, of Dalton, Massachusetts,

Now, THEREFORE, Winthrop M. Crane, Jr., agrees to advance the total sum of $100,000.00 to the Trustee, in sums of not less than $5,000.00 at any one time, and the Trustee shall give to Winthrop M. Crane, Jr., a note or notes signed by The Agricultural National Bank of Pittsfield as Trustee for Laurence R. Connor, Winthrop M. Crane, III, and Arthur E. Crane, such sums to be used by the Trustee from time to time for the purchase of common stock of the Eaton Paper Corporation, a corporation duly organized under the laws of Massachusetts, and having its usual place of business in Pittsfield, Massachusetts, at a price not exceeding $25.00 per share. Any and all purchases of stock are to be held by

the Trustee for the benefit of Laurence R. Connor, Winthrop M. Crane, III, and Arthur E. Crane, in equal shares.

The Trustee shall receive all dividends which might be declared and payable on the common stock purchased and shall deduct therefrom and remit semi-annually to Winthrop M. Crane, Jr., interest on moneys advanced, at an interest rate of 4% per annum.

The Trustee shall continue to purchase common stock of Eaton Paper Corporation as aforesaid until December 31, 1951, or upon the death of Winthrop M. Crane, Jr., shall such an event occur prior to December 31, 1951, at which time the Trustee shall turn over to Laurence R. Connor, Winthrop M. Crane, III, and Arthur E. Crane, in equal shares the common stock of Eaton Paper Corporation, receiving therefore the average cost price per share to the Trustee.

The Trustee shall on December 31st of each year, and upon the termination of this agreement, pay over to the beneficiaries any balance of income held by the Trustee after paying interest at the rate of 4% to Winthrop M. Crane, Jr. on any moneys advanced by him and any other charges which may have been or may be assessed against this account.

Upon the death of either Laurence R. Connor, Winthrop M. Crane III or Arthur E. Crane, before the termination of this agreement, the agreement shall continue for the benefit of the remaining beneficiary or beneficiaries.

This agreement can only be changed with the consent of Winthrop M. Crane, Jr. and at least two of the beneficiaries acting together.

If any one or all of the beneficiaries, at the termination of this agreement, should decline to pay for and receive their proportionate share of stock purchased by the Trustee, the stock shall then be turned over to Winthrop M. Crane, Jr. or his estate at the same average price at which the beneficiaries might have taken the stock in full settlement of all indebtedness to Winthrop M. Crane, Jr.

Upon termination of this agreement, any funds received by the Trustee in payment of the stock from Laurence R. Connor, Winthrop M. Crane, III, and Arthur E. Crane, shall be paid back to Winthrop M. Crane, Jr. or in the event of his death, to his estate, in full settlement of the advances made by him under this agreement.

During the life of the agreement the purchase price designated as a limit for the purchase of Eaton Paper Corp. stock was raised upon four occasions from $25 per share to $30 per share, from $30 per share to $35 per share, from $35 per share to $40 per share, and lastly a price not exceeding $50 per share. The agreement was also amended from time to time extending its term until December 31, 1959.

On February 1, 1950, August 17, 1950, July 23, 1952, November 14, 1952, and on August 5, 1953, Crane, Jr., transferred to the Agricultural National Bank the amounts of $10,000, $5,000, $5,000, $5,000, and $5,000, respectively, making $30,000 as the total amount he transferred in conformity with the agreement dated January 10, 1950. Such payments are reflected in the principal ledger record of the Agricultural National Bank.

From time to time, beginning with February 1, 1950, and ending with July 23, 1954, the Agricultural National Bank purchased from parties other than Crane, Jr., in conformity with the agreement of January 10, 1950, and the amendments thereto, shares of the common stock of the Eaton Paper Corp. totaling on and after July 24, 1954,

841 shares at a cost totaling $26,843.65, or approximately $31.92 per share, such purchases being reflected in the principal ledger record of the Agricultural National Bank. Such purchases were made from parties other than any petitioners herein or any petitioner's family.

After a number of opportunities for mergers and other business affiliations were explored by the Eaton Paper Corp. during the 1950's, on April 6, 1959, the Gorham Manufacturing Co. made a formal offer to purchase the shares of the Eaton Paper Corp. directly from the latter's shareholders at $110 per share. In a letter of April 8, 1959, the board of directors of the Eaton Paper Corp. informed their shareholders of the Gorham Manufacturing Co.'s offer and recommended its acceptance.

On May 8, 1959, in a letter addressed to the Agricultural National Bank as trustee, the beneficiaries requested the trustee to take steps to terminate the trust and to deliver to them their proportionate shares of the Eaton Paper Corp. stock in exchange for the payment provided for in the trust agreement.

In conformity with a letter-request of Crane III, Arthur E. Crane, and Connor, and as reflected in the principal ledger record of the Agricultural National Bank, transactions occurred as follows:

(a) On May 11, 1959, Crane III, Arthur E. Crane, and Connor each received 280 shares of the common stock of the Eaton Paper Corp. from the Agricultural National Bank.

(b) On May 15, 1959, Crane III, Arthur E. Crane, and Connor each paid $8,953.88 to the Agricultural National Bank.

(c) On May 29, 1959, Crane III, Arthur E. Crane, and Connor each received a small amount of cash resulting from the sale of the one remaining share of the common stock of the Eaton Paper Corp. by the Agricultural National Bank to the Gorham Manufacturing Co.

On May 15, 1959, Crane III, Arthur E. Crane, and Connor each sold his 280 shares of the common stock of the Eaton Paper Corp. at a gross sales price of $30,800, the expense of sale being $12.32, and the gain to each such person being $21,833.80, each of such petitioners having on or before May 12, 1959, deposited his 280 shares of the common stock of the Eaton Paper Corp. with the agent of the Gorham Manufacturing Co. in conformity with its offer of purchase of April 6, 1959.

The Agricultural National Bank on May 29, 1959, paid to Crane, Jr., the sum of $30,000, as reflected in its principal ledger record.

Dividends received by the Agricultural National Bank on the shares of common stock of the Eaton Paper Corp. were disbursed under the agreement to Crane III, Arthur E. Crane, and Connor.

All of the shares of common stock of the Eaton Paper Corp. were issued to "The Agricultural National Bank of Pittsfield, Trustee U/A Dated 1/10/50."

For each of the taxable years ended December 31, 1950, through December 31, 1958, and for the taxable period from January 1, 1959, through May 29, 1959, the Agricultural National Bank filed with the Department of Corporations and Taxation of the State of Massachusetts a fiduciary income tax return.  Thereon were reflected Massachusetts income taxes as follows:

| Year ended Dec. 31— | Massachusetts income tax |
|---|---|
| 1950 | $101.25 |
| 1951 | 127.53 |
| 1952 | 182.51 |
| 1953 | 229.63 |
| 1954 | 246.00 |
| 1955 | 175.23 |
| 1956 | 279.30 |
| 1957 | 310.32 |
| 1958 | 279.30 |
| Period ended May 29— | |
| 1959 | 98.86 |

For each of the taxable years ended December 31, 1950, through December 31, 1958, and for the taxable period from January 1, 1959, through May 29, 1959, the Agricultural National Bank filed with the district director of internal revenue at Boston, Mass., a U.S. fiduciary income tax return.  On each such return the Agricultural National Bank showed a zero net income taxable to it and a zero income tax liability.

In the above-mentioned Massachusetts and U.S. fiduciary income tax returns, the Agricultural National Bank represented that it was trustee of a trust created under an agreement dated January 10, 1950, and of which Crane, Jr., was the grantor and Crane III, Arthur E. Crane, and Connor were the income beneficiaries.

The principal issue is whether the gain realized by the Crane sons and Connor on the sale of their Eaton Paper Corp. stock is taxable as long-term or short-term capital gain.  Since there is no dispute as to the amount of the gain realized, the disagreement of the parties is narrowed to whether the provisions of section 1223(2),[2] I. R. C. 1954, operate to increase to more than 6 months the period during which the Crane sons and Connor are to be considered as having held the Eaton stock.

---

[2] SEC. 1223.  HOLDING PERIOD OF PROPERTY.
For purposes of this subtitle—

    *      *      *      *      *      *      *

(2) In determining the period for which the taxpayer has held property however acquired there shall be included the period for which such property was held by any other person, if under this chapter such property has, for the purpose of determining gain or loss from a sale or exchange, the same basis in whole or in part in his hands as it would have in the hands of such other person.

Respondent's position, succinctly stated, is that no valid trust was created by Crane, Jr.; that the bank was merely acting as the agent of Crane, Jr.; that the only right acquired by the Crane sons and Connor was an option to purchase the Eaton stock in the future; and that their purchase of such stock in May 1959 began their holding period. Petitioners counter with the contentions that a valid trust was created no later than February 1, 1950, when the trustee-bank made its first purchase of Eaton stock, because at that time there was a trust res in which the Crane sons and Connor had a beneficial interest; that a *completed gift of the stock* occurred when the first purchase was made by the trustee-bank with additional completed gifts of stock being made on the dates of each subsequent purchase by the bank; and that under section 1015 [3] of the 1954 Code the Crane sons and Connor take the same basis for the stock in the hands of the donor (Crane, Jr.) or the trustee-bank, thus entitling them to tack the trust's holding period to their own, which was less than 1 month.

While we think no beneficial interest in the Eaton stock vested in the Crane sons and Connor until they chose to exercise their option to purchase, we nevertheless agree with petitioners that a valid trust was created under Massachusetts law no later than February 1, 1950. Where there is no res at the time of the trust declaration, the rule in Massachusetts is that the trust will arise later when the res comes into existence accompanied by a manifestation of an intention to have a trust at that time. *Simpson* v. *Henry N. Clark Co.*, 316 Mass. 118, 55 N.E. 2d 10 (Mass. Sup. Ct. 1944); and *New England Trust Co.* v. *Sanger*, 149 N.E. 2d 598, 602 (Mass. Sup. Ct. 1957). In our opinion the subsequent conduct of Crane, Jr., shows a sufficient manifestation of a continuing intent to have a trust.

What we have here is a valid trust which came into existence no later than February 1, 1950, when the first Eaton stock was purchased by the trustee-bank, with an assignment of part of the dividend income from the stock, and an option granted to the Crane sons and Connor to purchase such stock upon the payment of the trustee's

---

[3] SEC. 1015. BASIS OF PROPERTY ACQUIRED BY GIFTS AND TRANSFERS IN TRUST.

(a) GIFTS AFTER DECEMBER 31, 1920.—If the property was acquired by gift after December 31, 1920, the basis shall be the same as it would be in the hands of the donor or the last preceding owner by whom it was not acquired by gift, except that if such basis (adjusted for the period before the date of the gift as provided in section 1016) is greater than the fair market value of the property at the time of the gift, then for the purpose of determining loss the basis shall be such fair market value. * * *

\* \* \* \* \* \* \*

(d) INCREASED BASIS FOR GIFT TAX PAID.—
    (1) IN GENERAL.—If—
        (A) the property is acquired by gift on or after the date of the enactment of the Technical Amendments Act of 1958, the basis shall be the basis determined under subsection (a), increased (but not above the fair market value of the property at the time of the gift) by the amount of gift tax paid with respect of such gift, * * *

average cost. Being an integral part of such trust agreement, the option became binding and enforceable once the trust came into existence.[4] There was never any gift of the Eaton stock as such, but only a gift of the option to acquire it by purchase. Hence we do not have a purchase of stock with a gift added. Although the Crane sons and Connor purchased the stock from the trustee-bank at what happened to be a bargain price, the gain was not a gift from Crane, Jr. They acquired the Eaton stock by purchase and their basis was their "cost" under section 1012. Their holding period began when they exercised the option. Since the option to purchase the stock did not constitute a present interest therein, the period during which the option was held unexercised cannot be added to the period subsequent to its exercise in determining the holding period. See *Helvering* v. *San Joaquin Fruit & Investment Co.*, 297 U.S. 496 (1936); *E. T. Weir*, 10 T.C. 996 (1948), affirmed per curiam 173 F.2d 222 (C.A. 3, 1949); *Max H. Wyman*, 33 T.C. 622 (1959); *John Hamilton Perkins*, 36 T.C. 313 (1961); and *D. C. Bothwell*, 27 B.T.A. 1351 (1933), affd. 77 F. 2d 35 (C.A. 10, 1935). The provisions of section 1223(2) are not applicable under these circumstances and therefore, the Crane sons and Connor are not entitled to carry over the transferor's basis or tack its holding period to their own. Accordingly, we hold that they realized short-term capital gain upon the sale of their shares of the Eaton stock.

Finally, we must consider whether the dividend income from the Eaton stock distributed by the trustee-bank is to be attributed to Crane, Jr., as respondent contends, or to the Crane sons and Connor, as petitioners contend.

As discussed previously, we regard the trust as valid. Since Crane, Jr., had a reversionary interest in the trust res (the Eaton stock) within the meaning of section 673(a) of the 1954 Code, he must be treated as the owner of the stock until the option was exercised. Consequently, he is taxable under section 671 on the dividends received therefrom.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

BRUCE, *J.*, concurs in the result.

---

[4] In Massachusetts the settlor of a trust may grant the power of revocation or alteration to others. *State Street Trust Co.* v. *Crocker*, 306 Mass. 257, 28 N.E. 2d 5 (Mass. Sup. Ct. 1940). Here the trust agreement provided that it could only be changed with the consent of Crane, Jr., and at least two of the beneficiaries. Where a method of revocation or alteration is provided in the trust instrument, an effective revocation or change can be made only by pursuing the method prescribed. *Kerwin* v. *Donaghy*, 317 Mass. 559, 59 N.E. 2d 299 (Mass. Sup. Ct. 1945) ; and *Phelps* v. *State Street Trust Co.*, 330 Mass. 511, 115 N.E. 2d 382 (Mass. Sup. Ct. 1953). The reservation of such a power is not inconsistent with the creation of a valid trust. *National Shawmut Bank of Boston* v. *Joy*, 315 Mass. 457, 53 N.E. 2d 113 (Mass. Sup. Ct. 1944).

TANNENWALD, *J.*, concurring: I desire to record my separate views because of the possibility that certain language in the majority opinion may be given a broader application than is warranted.

I am far from convinced that a trust was in fact created in the instant situation. In substance, the transaction seems to have been no more than an option with the shares pledged with the Agricultural Bank as collateral to assure the so-called beneficiaries that the shares would be transferred if the option was exercised.

Whether the transaction is considered a trust with an option or a collateralized option unfettered by a trust characterization, the basic issue herein is *how* the shares were acquired. If they were acquired in whole or in part by gift, there is a transfer of basis under section 1015 and there is a "tacking" of the holding period under section 1223(2).[1] Resolution of this issue turns upon a decision as to whether the gift, if any, is reflected in the acquisition of the shares or in the option itself.

The majority concludes that if there was any gift[2] it was reflected in the option itself. The dissent concludes that the gift was reflected in the acquisition of the shares and further concludes that section 1223(2) applies because the dollar amount paid upon exercise was exactly the same as the cost basis to the donor. In this latter connection, I disagree that mere dollar equivalent satisfies the "same basis" requirement of section 1223(2). It seems clear to me that Congress intended a conceptual application of this phrase, i.e., to describe the character of the transaction by which the property was acquired.[3]

The language of the majority opinion does not appear to be limited to the situation where the option has independent significance prior to exercise, as distinguished from a situation where the option is illusory—for example, because it is revocable or is so surrounded by restrictions or contingencies as to be meaningless or is otherwise valueless. To me, this is a critical distinction. If an option has independent significance, I would hold that the gift, if any, was reflected in the

---

[1] It is not necessary to decide whether the splitting of basis is precluded where the transfer is part gift and part purchase, at least where the issue involves the transferee's basis. Cf. *Elizabeth H. Potter*, 38 T.C. 951 (1962) ; *Reginald Fincke*, 39 B.T.A. 510 (1939) ; see Wurzel, "The Tax Basis for Assorted Bargain Purchases," 20 Tax L. Rev. 165, 177 (1964). Nor is it necessary to decide whether the phrase "in whole or in part" in sec. 1223(2) requires a "tacking" of the holding period of the donor with respect to all the property or permits a "tacking" of the holding period only to the gift element of the transaction.

[2] Connor did not have the familial relationship to Crane, Jr. He was president of the Agricultural Bank, which was the so-called trustee and which had had a long business relationship with Eaton Paper Corp. As to him, there may well not have been a gift under any circumstances, but the record is insufficient to permit a determination on this point.

[3] It should be noted that the facts of this case do not entirely fit the standard laid down by the dissent. The so-called beneficiaries acquired the shares at an average cost; as to any particular share, this amount could be more than, less than, or exactly equal to the amount paid for the shares upon original acquisition.

option itself; if an option is illusory, it may well be that the gift does no occur until the actual transfer of the property at a bargain price. Cf. *Commissioner* v. *LoBue*, 351 U.S. 243, 248 (1956); *Commissioner* v. *Smith*, 324 U.S. 695 (1945); *Gem Securities Corporation* v. *United States*, 102 Ct. Cl. 86, 55 F. Supp. 109, 116 (1944).

The record before us is devoid of any evidence, and the briefs are likewise silent, as to whether the option herein had sufficient substance as to have independent significance prior to exercise. Under such circumstances and keeping in mind that the burden is on the taxpayer, I agree with the majority decision for the respondent.[4]

SIMPSON, J., agrees with this concurring opinion.

---

WITHEY, J., dissenting: I dissent from the majority opinion herein for the reason that it confuses the *option* to buy stock with the stock itself. I agree that the so-called trust agreement conveyed nothing to the so-called beneficiaries except an option to purchase stock, but we are not concerned here with the holding period of the option; we are concerned only with the holding period of the stock in the hands of the "beneficiaries" prior to its sale by them. Crane, Jr., cannot be said to have held only a reversionary interest in the stock but must be held to have retained the beneficial ownership of the stock itself inasmuch as the operation of the agreement did not effectuate a transfer to the so-called beneficiaries of any interest in the stock itself. I agree that Crane, Jr., is taxable upon the dividend income from the stock prior to its purchase by the "beneficiaries" but only upon the ground that he owned all the beneficial interest in the stock until such time as the option was exercised and therefore under *Lucas* v. *Earl*, 281 U.S. 111 (1930), he is chargeable with the income therefrom.

The majority opinion holds that because there was a valid trust under State law, section 1223(2) of the 1954 Code has no application. I would agree that this would be true had it been the operation of the

---

[4] Indeed, there is some evidence in the record from which it can be inferred that the options herein did have some such significance. The shares of Eaton Paper Corp. were traded over the counter. For aught that appears, the options were fully transferable. Cf. sec. 1.421-6(c), Income Tax Regs. It is possible that, under the terms of the instrument, the rights of each optionee terminated upon death, but, since this involves only an actuarial factor, it would merely reduce rather than destroy the value of the option. *Goodwin* v. *McGowan*, 47 F. Supp. 798 (W.D.N.Y. 1942). With respect to the issue of revocability, even a simple option not supported by consideration can be irrevocable. See, e.g., N.Y. General Obligations Laws, sec. 5-1109, which was enacted in 1964, replacing N.Y. Pers. Prop. Law, sec. 28. It may well be that in the instant situation the collateralization of the option was an effective substitute for consideration. In any event, petitioners have not sought to show us that the options were so readily revocable by Crane, Jr., as to preclude a finding of independent significance.

trust instrument which transferred the stock, as distinguished from the option, to the "beneficiaries," but even the majority must agree that this is not true. The transfer of the stock to the "beneficiaries" was effectuated only and solely by their purchase of it. For that reason, it seems to me that the plain wording of the above section requires its application to the holding period of that stock. It makes no difference whether the stock was acquired from Crane, Jr., directly, from him indirectly through the trust, or directly from the trust because the wording of the statute relates to property "*however* acquired." (Emphasis added). The plain wording provides that there shall be included in the "beneficiary's" holding period "the period for which such property was held by any other person." The only qualification contained in the section is that under the chapter containing the section such property must have "for the purpose of determining gain or loss from a sale or exchange, the same basis in whole or in part in his [the "beneficiary's"] hands as it would have in the hands of such other person." Further, the respondent's regulations would appear to permit the "tacking" of holding periods in the situation where property is transferred partially by way of gift and partially as a sale. Sec. 1.1015-4(b), Income Tax Regs. The "beneficiaries" having individually paid for the stock in issue exactly the amount which it cost the seller (whoever the seller may be), it must be said that the "beneficiaries'" basis was the same as the seller's. There was no gift of the stock which would bring section 1015 (a) and (d) into effect; there was only a gift of an option even under the theory of the majority opinion. I would hold that the holding periods of the purchasers and seller of the stock must be tacked together under this section.